# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS
### No. 19-540V
### Filed: June 3, 2025

MARIA TORRES,

                Petitioner,

v.

SECRETARY OF HEALTH AND
HUMAN SERVICES,

                Respondent.

Special Master Horner

*Joseph Alexander Vuckovich, Mctlaw, Washington, D.C., for petitioner.*
*Dorian Hurley, U.S. Department of Justice, Washington, D.C., for respondent.*

## RULING ON ENTITLEMENT[1]

On April 11, 2019, petitioner filed a petition under the National Childhood Vaccine Injury Act, 42 U.S.C. § 300aa, *et seq.* (2012),[2] alleging that she suffered a Table Injury of a shoulder injury related to vaccine administration ("SIRVA") as a result of an influenza ("flu") vaccination she received on October 18, 2016.  (ECF No. 1.)[3] Alternatively, petitioner alleged a shoulder injury caused in fact or significantly aggravated by her vaccination.  (*Id.* at 4.)  For the reasons set forth below, I conclude that petitioner is entitled to compensation.

---

[1] Because this document contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002.  44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services).  **This means the document will be available to anyone with access to the internet.**  In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] Within this decision, all citations to § 300aa will be the relevant sections of the Vaccine Act at 42 U.S.C. § 300aa-10, *et seq.*

[3] The petition was initially filed under a different surname.  The caption was amended as of November 1, 2022.  (ECF No. 67.)

## I.    Applicable Statutory Scheme

Under the National Vaccine Injury Compensation Program, compensation awards are made to individuals who have suffered injuries after receiving vaccines. In general, to gain an award, a petitioner must make a number of factual demonstrations, including showing that an individual received a vaccination covered by the statute; received it in the United States; suffered a serious, long-standing injury; and has received no previous award or settlement on account of the injury. Finally – and the key question in most cases under the Program – the petitioner must also establish a *causal link* between the vaccination and the injury. In some cases, the petitioner may simply demonstrate the occurrence of what has been called a "Table Injury." That is, it may be shown that the vaccine recipient suffered an injury of the type enumerated in the "Vaccine Injury Table," corresponding to the vaccination in question, within an applicable time period following the vaccination also specified in the Table. If so, the Table Injury is presumed to have been caused by the vaccination, and the petitioner is automatically entitled to compensation, unless it is affirmatively shown that the injury was caused by some factor other than the vaccination. § 300aa-13(a)(1)(A); § 300aa-11(c)(1)(C)(i); § 300aa-14(a); § 300aa-13(a)(1)(B).

As relevant here, the Vaccine Injury Table lists SIRVA as a compensable injury if it occurs within ≤48 hours of administration of a flu vaccine. § 300aa-14(a), *amended by* 42 C.F.R. § 100.3. Table Injury cases are guided by a statutory "Qualifications and aids in interpretation" ("QAI"), which provides more detailed explanation of what should be considered when determining whether a petitioner has actually suffered an injury listed on the Vaccine Injury Table. § 300aa-14(a). To be considered a Table SIRVA petitioner must show that his/her injury fits within the following definition:

> SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis . . . . A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:
>
> (i)     No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;
>
> (ii)    Pain occurs within the specified time-frame;

    (iii)     Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

    (iv)     No other condition or abnormality is present that would explain the patient's symptoms (e.g. NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, and any other neuropathy).

42 C.F.R. § 100.3(c)(10).

Alternatively, if no injury falling within the Table can be shown, a petitioner could still demonstrate entitlement to an award by instead showing that the vaccine recipient's injury or death was caused-in-fact by the vaccination in question. § 300aa-13(a)(1)(A); § 300aa-11(c)(1)(C)(ii). In particular, a petitioner must demonstrate that the vaccine was "not only [the] but-for cause of the injury but also a substantial factor in bringing about the injury." *Moberly v. Sec'y of Health & Human Servs.*, 592 F.3d 1315, 1321-22 (Fed. Cir. 2010) (quoting *Shyface v. Sec'y of Health & Human Servs.*, 165 F.3d 1344, 1352-53 (Fed. Cir. 1999)); *Pafford v. Sec'y of Health & Human Servs.*, 451 F.3d 1352, 1355 (Fed. Cir. 2006). To successfully demonstrate causation-in-fact, petitioner bears a burden to show: (1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of a proximate temporal relationship between vaccination and injury. *Althen v. Sec'y of Health & Human Servs.*, 418 F.3d 1274, 1278 (Fed. Cir. 2005).

For both Table and Non-Table claims, Vaccine Program petitioners bear a "preponderance of the evidence" burden of proof. § 300aa-13(1)(a). That is, a petitioner must offer evidence that leads the "trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the [judge] of the fact's existence." *Moberly*, 592 F.3d at 1322 n.2 (alterations in original); *see also Snowbank Enters., Inc. v. United States*, 6 Cl. Ct. 476, 486 (1984) (mere conjecture or speculation is insufficient under a preponderance standard). Proof of medical certainty is not required. *Bunting v. Sec'y of Health & Human Servs.*, 931 F.2d 867, 873 (Fed. Cir. 1991). A petitioner may not receive a Vaccine Program award based solely on her assertions; rather, the petition must be supported by either medical records or by the opinion of a competent physician. § 300aa-13(a)(1).

Cases in the Vaccine Program are assigned to special masters who are responsible for "conducting all proceedings, including taking such evidence as may be appropriate, making the requisite findings of fact and conclusions of law, preparing a decision, and determining the amount of compensation, if any, to be awarded." Vaccine Rule 3(b)(1). Special masters must ensure each party has had a "full and fair opportunity" to develop the record. Vaccine Rule 3(b)(2). However, special masters are empowered to determine the format for taking evidence based on the circumstances

of each case.  Vaccine Rule 8(a); Vaccine Rule 8(d).  Special masters are not bound by common law or statutory rules of evidence but must consider all relevant and reliable evidence in keeping with fundamental fairness to both parties.  Vaccine Rule 8(b)(1).  The special master is required to consider "all . . . relevant medical and scientific evidence contained in the record," including "any diagnosis, conclusion, medical judgment, or autopsy or coroner's report which is contained in the record regarding the nature, causation, and aggravation of the petitioner's illness, disability, injury, condition, or death," as well as the "results of any diagnostic or evaluative test which are contained in the record and the summaries and conclusions."  § 300aa-13(b)(1).  The special master is required to consider all the relevant evidence of record, draw plausible inferences, and articulate a rational basis for the decision.  *Winkler v. Sec'y of Health & Human Servs.*, 88 F.4th 958, 963 (Fed. Cir. 2023) (citing *Hines ex rel. Sevier v. Sec'y of Health & Human Servs.*, 940 F.2d 1518, 1528 (Fed. Cir. 1991)).

## II.    Procedural History

Based on the allegations in the petition, this case was initially assigned to the Chief Special Master as part of the Special Processing Unit ("SPU"), which is intended to expedite cases having a high likelihood of informal resolution.  (ECF No. 6.)  Petitioner filed medical records marked as Exhibits 1-6, an affidavit marked as Exhibit 7, and a Statement of Completion in April of 2019.  (ECF Nos. 7-8.)  About a year later, respondent completed a preliminary medical review and determined that additional records, namely the record of an independent medical exam ("IME"), were needed.  (ECF No. 22.)  Petitioner then filed disability records in November and December of 2020.  (ECF Nos. 34, 36; Exs. 8-10.)

On May 25, 2021, respondent filed his Rule 4 Report, recommending against compensation.  (ECF No. 44.)  Regarding petitioner's Table SIRVA claim, respondent contended that a biceps tendon tear constituted a condition or abnormality that would otherwise explain petitioner's symptoms under the fourth SIRVA QAI criterion.  (*Id.* at 8.)  Respondent did not address petitioner's alternative cause-in-fact claim apart from noting her preponderant burden of proof in that context.  (*Id.* at 7-8.)

Thereafter, the case was reassigned out of the SPU and to another special master.  (ECF Nos. 45-46.)  Petitioner then filed additional evidence in June and August of 2021 and an expert report by orthopedic surgeon Benjamin Busfield, M.D., in March of 2022.  (ECF No. 47, 49, 56; Exs. 11-16.)  Respondent filed a responsive expert report by orthopedic surgeon Brian Feeley, M.D., in July of 2022.  (ECF No. 60; Exs. A-B.)  Petitioner filed a supplemental expert report by Dr. Busfield in October of 2022.  (ECF No. 64; Exs. 17-20.)

On March 20, 2023, respondent filed an amended Rule 4 Report.  (ECF No. 72.)  Based on review of the parties' expert reports, respondent conceded that petitioner's biceps tear was likely "an incidental finding."  (*Id.* at 10 (quoting Ex. A, p. 4).)  However, respondent's expert concluded that petitioner more likely suffered biceps tendinitis, unrelated to any SIRVA and without reduced range of motion.  (*Id.* at 9-10.)  Thus,

respondent continued to maintain that petitioner could not satisfy the fourth QAI criterion for a Table SIRVA, albeit for different reasons. (*Id.* at 10-11.) The parties exchanged further expert reports (ECF Nos. 74, 77; Exs. C, 21-22) and then concluded that the case was ripe for resolution on the written record (ECF No. 82).

On April 29, 2024, petitioner filed a motion for a ruling on the written record, seeking a finding that she is entitled to compensation for her alleged SIRVA. (ECF No. 84.) Within her motion, petitioner primarily addressed her allegation of a Table Injury of SIRVA, but she also argued that she could meet her burden of proof for causation-in-fact and that, following either analysis, respondent could not demonstrate her injury to be due to factors unrelated to her vaccination. (*Id.*) Respondent filed his response on July 12, 2024. (ECF No. 86.) Respondent argued that petitioner cannot meet her burden of proof relative to either a Table SIRVA or a shoulder injury caused-in-fact by her vaccination. Accordingly, respondent stressed that the burden of proof does not shift to him to affirmatively demonstrate a factor unrelated to vaccination as the cause of petitioner's injury. (*Id.*) Petitioner filed her reply on August 19, 2024. (ECF No. 90.)

On September 10, 2024, the case was reassigned to the undersigned. (ECF No. 92.) The following day, the parties confirmed via a Joint Status Report that they believed the case remained ripe for resolution based on petitioner's pending motion. (ECF No. 93.)

In light of the above, I have determined that the parties have had a full and fair opportunity to present their cases and that it is appropriate to resolve entitlement on the existing record. *See* Vaccine Rule 8(d); Vaccine Rule 3(b)(2); *see also Kreizenbeck v. Sec'y of Health & Human Servs.*, 945 F.3d 1362, 1366 (Fed. Cir. 2020) (noting that "special masters must determine that the record is comprehensive and fully developed before ruling on the record").

### III.    Factual History

Petitioner received the vaccination at issue in her left shoulder on October 18, 2016, at her place of employment. (Ex. 1, pp. 3-4; Ex. 3, p.20.) She was 27 years old at the time and had a history of an employment-related back injury in July of that year, for which she had previously been on modified duty and referred to physical therapy. (Ex. 3, pp. 7-10.)

About six days post-vaccination, on October 24, 2016, petitioner presented to occupational health. (Ex. 3, p. 20.) She reported that she did not think her flu vaccination had been administered correctly. She experienced "a lot of pain" in her left shoulder accompanied by numbness, tingling, and shooting pain affecting her neck and arm. (*Id.*) By the time of this encounter, her numbness and shooting pain had resolved, but her shoulder remained sore. She also reported difficulty with range of motion due to the pain, which was improving, as well as crepitus. (*Id.*) Physical exam was normal

except for end of range pain[4] with internal rotation and crepitus on palpation. (*Id.* at 21.) Petitioner was diagnosed with "[a]cute pain of left shoulder." She was prescribed an oral pain medication with an additional recommendation for use of an over-the-counter topical analgesic and a heating pad. She was instructed to follow up in two days but remained on full work duty. (*Id.* at 21-22.) Petitioner returned on October 26, 2016. (*Id.* at 23.) At that point, her pain had reportedly resolved, although she still had non-painful crepitus, but with full range of motion. (*Id.*) She was discharged as having reached maximum medical improvement. (*Id.* at 24.)

About two weeks later, on November 8, 2016, petitioner sought the opinion of a physical medicine and rehabilitation specialist, Dr. Bajaj, regarding her left shoulder pain. (Ex. 2, p. 12.) Petitioner provided substantially the same history she had provided at her initial occupational health encounter, though it was recorded in greater detail. (*Id.*) However, she reported that her pain, though it had been improving, began to come back around November 4, but without trauma or injury. (*Id.* at 12-13.) As of her November 8 encounter, petitioner's pain was located on the anterior aspect of the left shoulder and around to the anterior and lateral midarm. She also continued to have cracking and popping with movement. The pain was dull at rest, sharp with movement, ranging from 6-8 on a 10-point scale, and with no numbness or tingling. (*Id.* at 13.) On physical exam, petitioner had slightly reduced range of motion relative to her opposite shoulder with flexion and abduction, but not internal or external rotation, though she reported pain with all of these maneuvers. (*Id.* at 15.) She did not have tenderness to palpation, except behind the shoulder. (*Id.* at 16.) She tested positive for signs of impingement (Neer and Hawkins tests[5]) and was negative for signs of biceps pathology (speed's test[6]). (*Id.*) Dr. Bajaj suspected a SIRVA and recommended an MRI to evaluate the shoulder pathology. Given the earlier radiating pain and numbness, he also felt an EMG/NCS would be appropriate to rule out any neuropathy. (*Id.* at 17.)

On November 14, 2016, petitioner completed the recommended EMG/NCS, which showed mild ulnar neuropathy across the wrist, but no evidence of any brachial plexopathy or radiculopathy. (Ex. 2, p. 26.) Petitioner completed the recommended

---

[4] The record states "ERP" with internal rotation. *See* NEIL M. DAVIS, MEDICAL ABBREVIATIONS: 55,000 CONVENIENCES AT THE EXPENSE OF COMMUNICATION AND SAFETY 213 (16th ed. 2020) (defining "ERP" as "end-range pain").

[5] The "Neer impingement test" is "designed to reproduce symptoms of rotator cuff impingement through flexing the shoulder and pressure application," and a test is considered positive if pain in the anterior or lateral shoulder is reproduced when in full flexion. *Neer Impingement Test*, WIKIPEDIA, https://en.wikipedia.org/wiki/Neer_impingement_test (last visiting June 3, 2025). Positive "Hawkins-Kennedy test" is "indicative of impingement of all structures that are located between the greater tubercle of the humerus and the coracohumeral ligament. The impinged structures include the supraspinatus muscle, teres minor muscle, and the infraspinatus muscle." *Hawkins-Kennedy Test*, WIKIPEDIA, https://en.wikipedia.org/wiki/Hawkins%E2%80%93Kennedy_test (last visited June 3, 2025). A Hawkins test is considered positive when pain is reproduced below the acromioclavicular joint with internal rotation. *Id.*

[6] The "Speed's test" is used to test for superior labral tears or bicipital tendinitis, and the test is considered positive if pain is reproduced in the bicipital tendon or bicipital groove. *Speeds Test*, PHYSIOPEDIA, https://www.physio-pedia.com/Speeds_Test (last visited June 3, 2025).

MRI study on November 18, 2016. (*Id.* at 19-20.) It showed an intact rotator cuff, minimal edema (and trace subcortical bone marrow edema) along the supraspinatus tendon thought to potentially be tendinitis and a longitudinal split tear of the biceps tendon at the bicipital groove. (*Id.*) Based on the test results, Dr. Bajaj diagnosed petitioner's shoulder pain as secondary to a bicipital tear and referred her to physical therapy. (Ex. 6, pp. 35-37.) However, petitioner requested referral to a shoulder specialist for a second opinion as of December 6, 2016. (Ex. 2, p. 34.) Petitioner then saw orthopedic surgeon, Dr. Garbis, on December 8, 2016. (*Id.* at 35.) Petitioner's physical examination was notable for positive speed's and Yergason's tests.[7] (*Id.* at 36.) Dr. Garbis also assessed a biceps tear. (*Id.*) He explained that he was unsure of the etiology of the tear, but he doubted that it could have resulted from the vaccination needle. He left open the possibility that the flu vaccination, and lack of movement, aggravated the pre-existing tear. (*Id.*) He recommended physical therapy and nonsteroidal anti-inflammatory medication. (*Id.*)

Thereafter, petitioner pursued physical therapy between December of 2016 and May of 2017. (Ex. 2, pp. 139-412.) She continued to follow up with Drs. Bajaj and Garbis and had a steroid injection into her left shoulder on February 21, 2017. (*Id.* at 49, 57, 65, 73.) After failing conservative measures, on June 19, 2017, petitioner underwent a left shoulder arthroscopy with debridement and a left open biceps tenodesis. (*Id.* at 82, 413.) Petitioner's post-operative diagnosis was biceps tendinopathy. During surgery, it was observed that petitioner had inflammatory tissue at the rotator interval anteriorly extending down to the biceps groove as well as some, albeit minimal, inflamed bursa in the subacromial space. (*Id.* at 413-14.)

Petitioner returned to physical therapy following her surgery, which she pursued from June to December of 2017. (Ex. 2, pp. 415-610.) Petitioner continued to complain of pain and reduced range of motion. (*See, e.g.*, Ex. 2, p. 98.) However, a disability claim was denied due to lack of support for any functional loss subsequent to October 27, 2017. (Ex. 10, pp. 64-65, 1084.)

---

[7] The "Yergason's test" is performed to identify pathology involving the biceps tendon or glenoid labrum, and the test is considered positive if pain in the bicipital groove is reproduced "indicating biceps tendinitis, subluxation of the long head of the biceps brachii muscle, and presence of a SLAP tear." *Yergason's Test*, WIKIPEDIA, https://en.wikipedia.org/wiki/Yergason%27s_test (last visited June 3, 2025).

## IV.    Expert Opinions

### a.  Benjamin Busfield, M.D., for petitioner[8]

According to Dr. Busfield, the nature of petitioner's post-vaccination symptoms, the fact that symptoms occurred directly after vaccination, and the lack of any pre-existing symptoms affecting the shoulder, all point to petitioner's flu vaccine as the sole cause of her condition.  Thus, he opines that Dr. Bajaj was correct in his initial assessment of SIRVA.  (Ex. 14, p. 7.)  He opines that petitioner satisfies all four of the Table SIRVA criteria.  (*Id.* at 7-8.)

Dr. Busfield opines that the biceps tendon tear was only "an incidental finding" and that petitioner's SIRVA is represented by the separate finding of rotator interval inflammation observed during her surgery, which was sufficient to explain her pain.  (Ex. 14, p. 8.)  Dr. Busfield disagrees with respondent's expert's opinion that the inflammation around the rotator cuff is nonspecific and subjective.  (Ex. 21, p. 3.)  He states that

> Rotator cuff inflammation indicates a pathologic process around the shoulder tendons, which is very specific.  Rotator [cuff] interval inflammation is consistent with frozen shoulder and not biceps tendinitis, and I have never seen rotator [cuff] interval synovitis from isolated biceps tendinitis in my 15-year career.  I see synovitis most commonly with significant rotator cuff pathology, past injury, and frozen shoulder.

(*Id.*)  Moreover, Dr. Busfield stresses that petitioner's surgery included arthroscopic debridement in addition to tenodesis, confirming that the issue was not limited to biceps tendinitis.  (*Id.*)  To Dr. Busfield, the fact that Dr. Garbis's surgical report referenced the history of petitioner's vaccination under operative indications, confirms the understanding that petitioner's vaccination was felt to be relevant to the pathology at issue.  (*Id.* at 4-5 (discussing Ex. 2, pp. 413-14).)

Dr. Busfield indicates that biceps tendinitis is rarely seen in isolation, noting that only 5% of patient with biceps tendinitis have primary biceps tendinitis.  (Ex. 21, p. 4.)  Instead, it is frequently associated with rotator cuff pathology, bursitis, labral pathology, or acromioclavicular joint pain.  (Ex. 17, p. 4 (citing Douglas P. Beall et al., *Association of Biceps Tendon Tears with Rotator Cuff Abnormalities: Degree of Correlation with Tears of the Anterior and Superior Portions of the Rotator Cuff*, 180 AM. J. ROENTGENOLOGY 633 (2003) (Ex. 20)).)  He further stresses that it is mostly seen in young athletes.  (Ex. 17, p. 4; Ex. 21, p. 4.)  Thus, Dr. Busfield concludes it is unlikely

---

[8] Dr. Busfield received his medical degree from Georgetown University before going on to complete a fellowship at Kerlan-Jobe Orthopedic Clinic, as well as a residency and internship at the University of California, San Francisco.  (Ex. 14, p. 1.)  As a board-certified orthopedic surgeon, Dr. Busfield's clinical practice covers a variety of orthopedic surgery techniques, including shoulder replacement, arthroscopy, and sports medicine.  (*Id.*)  He has also published several pieces of medical literature on shoulder surgery with a specific focus on rotator cuff arthroscopic repair.  (*Id.*)

petitioner would have suddenly developed an isolated biceps tendinitis coincident to what would otherwise be a causative factor (*i.e.*, vaccination) in the development of SIRVA.  (Ex. 17, p. 4)

Despite the focus in the medical records on a biceps pathology, Dr. Busfield stresses that petitioner's physical exam findings were more consistent with bursitis or frozen shoulder.  (Ex. 17, p. 3.)  In particular, he notes that Dr. Bajaj's initial evaluation documented pain radiating to the anterior and lateral mid-arm whereas biceps tendinitis classically affects the direct anterior aspect of the shoulder.  (*Id.* (discussing Ex. 2, p. 13).)  In that regard, Dr. Busfield stresses that petitioner's surgical findings noted inflammation affecting the anterior rotator cuff interval, which he opines is a pattern of inflammation consistent with SIRVA.  (Ex. 21, pp. 2-3 (discussing Ex. 2, pp. 413-14).)  Moreover, limitation in abduction and flexion was more consistent with bursitis and/or frozen shoulder.  (Ex. 17, p. 3 (discussing Ex. 2, p. 13).)  Petitioner was also observed to have signs of impingement and reduced range of motion on later physical exams.  (*Id.* (discussing Ex. 2, pp. 34, 65, 414); *see also* Ex. 21, p. 2.)

Dr. Busfield also disagrees with respondent's expert regarding the significance of petitioner's February 21, 2017 therapeutic injection.  (Ex. 17, p. 2; Ex. 21, pp. 2-3.)  Whereas Dr. Feeley opined that petitioner's partial response to that injection is consistent with biceps tendinitis as the source of her pain, Dr. Busfield opines that intra-articular injection is not a treatment for biceps tendinitis.  Instead, it would be more likely that a partial response to a glenohumeral joint injection would be indicative of an issue, such as frozen shoulder, stemming from the adjacent subacromial space.  In fact, Dr. Busfield suggests that Dr. Garbis's decision to utilize an injection into the joint may indicate that a shoulder pathology was suspected, given that this would be clinically appropriate for petitioner's reduced range of motion, but not otherwise indicated based on the clinical focus on the biceps tendon.  (Ex. 17, pp. 2-3.)

Dr. Busfield additionally set forth an opinion based on causation in fact.  (Ex. 14, pp. 9-11.)  He theorizes that an intramuscular deltoid injection can penetrate the subacromial space, resulting in either mechanical trauma or an immune response leading to inflammation that results in bursitis and impingement and, with immobilization, secondary adhesive capsulitis.  (*Id.* at 9-10 (citing Adam T Hexler et al., *Management of Glenohumeral Synovitis Secondary to Influenza Vaccination*, 7 SHOULDER & ELBOW 100 (2015) (Ex. 15); Patrick J. Messerschmitt et al., *Progressive Osteolysis and Surface Chondrolysis of the Proximal Humerus Following Influenza Vaccination*, 35 ORTHOPEDICS e283 (2012) (Ex. 16)).)  Dr. Busfield opines that petitioner's onset of shoulder pain within 24 hours of vaccination is consistent with the expected timing pursuant to this theory and that her post operative finding of rotator cuff inflammation and the overall circumstances of her clinical history support a logical sequence of cause and effect supporting vaccine causation.  (*Id.* at 10-11.)

### b.  Brian Feeley, M.D., for respondent[9]

Dr. Feeley opines that petitioner's post-vaccination clinical presentation is explained by biceps tendinitis, rather than a SIRVA.  (Ex. A, p. 4.)  Moreover, he opines that a vaccine injection would not be a cause of biceps tendinitis.  (*Id.* at 5.)  Dr. Feeley suggests that petitioner's physical examinations consistently documented anterior pain, as well as positive signs of biceps irritation.  (*Id.* at 4, 9.)  Additionally, her MRI did not detect any bursitis, a common finding in SIRVA.  (*Id.* at 4.)  Finally, her partial response to a glenohumeral joint injection and physical therapy also point to biceps tendinitis as the source of her pain.  (*Id.* at 4-5.)  Dr. Feeley agrees that petitioner's biceps tear is likely to be an incidental finding, but opines that the biceps tendinitis is nonetheless the primary source of pain given the consistency of her reports of biceps pain on exam and her positive Speed's and Yergason's tests.  (*Id.* at 4, 9; *see also* Ex. C, pp. 1-2.)  Biceps tendinitis was the indication for her surgery, and the surgical finding of inflammation around the rotator cuff is nonspecific, subjective, and likely to be sequela of the biceps tendinitis.  (Ex. A, p. 9.)  By contrast, indicators of frozen shoulder and/or impingement were not consistently seen.  (*Id.* at 9-10.)

Regarding causation-in-fact, Dr. Feeley appears to agree that vaccinations involving needle overpenetration can cause an acute inflammatory response leading to subacromial bursitis, but disputes that this type of reaction could result in a rotator cuff tear.  He opines that petitioner had no bursitis or subacromial fluid collection and only mild tendinopathy in the rotator cuff.  (Ex. A, p. 8.)  Stressing that rotator cuff pathology is common among those over the age of 50, Dr. Feeley suggests there is a high risk of erroneous attribution when vaccine administration is merely coincidental to common shoulder pathologies.  (*Id.* at 8-9.)  He disputes any direct causal relationship between deltoid trauma (without subacromial penetration) and adhesive capsulitis.  (*Id.* at 10.)

Dr. Feeley explains biceps tendinitis as inflammation of the long head of the biceps tendon, which can cause the tendon sheath to thicken and sometimes result in tearing.  Biceps tendinitis can be associated with rotator cuff tearing in patient's over 50 years of age and also appear in patients between ages 30-40.  (Ex. A, p. 6.)  "In most cases, damage to the biceps tendon is due to a lifetime of normal activities," with age-related degeneration worsened by overuse.  (*Id.*)  Sports, as well as repetitive manual labor, can cause overuse damage.  (*Id.*)  Biceps tenodesis has a success rate of 90%.  (*Id.*)  In petitioner's case, however, Dr. Feeley opines that petitioner's failure to improve following surgery is consistent with secondary gain relative to her workers'

---

[9] Dr. Feeley received his medical degree from Stanford University, before going on to complete a residency in orthopedic surgery at the University of California, Los Angeles, and a fellowship in sports medicine and shoulder surgery at the Hospital for Special Surgery in New York, New York.  (Ex. B, p. 1.)  From there, Dr. Feeley accepted a position as an assistant professor in residence of orthopedic surgery at the University of California, San Francisco.  (*Id.*)  He was eventually promoted to professor in residence in 2018.  (*Id.*)  In his research capacity, Dr. Feeley has authored over 240 peer-reviewed manuscripts, several review papers and book chapters, and a book on rotator cuff tears.  (Ex. A, p. 1; Ex. B, pp. 29-47.)  In his clinical capacity, Dr. Feeley sees patients "with all types of shoulder pathologies including rotator cuff injuries, shoulder arthritis, shoulder instability, and adhesive capsulitis."  (Ex. A, p. 1.)

compensation claim. (*Id.* at 10 (citing Eric R. Wagner et al., *The Impact of Workers' Compensation on Recovery After Biceps Tenodesis*, 29 J. SHOULDER & ELBOW SURGERY 1783 (2020) (Ex. A, Tab 13); Yining Lu et al., *Influence of Workers' Compensation Status on Postoperative Outcomes in Patients Following Biceps Tenodesis: A Matched-Pair Cohort Analysis*, 29 J. SHOULDER & ELBOW SURGERY 2530 (2020) (Ex. A, Tab 14)).)

### V.    Analysis

#### a.  Table Injury of SIRVA

As discussed above, petitioner is entitled to a presumption of causation if she can establish by preponderant evidence that her injury arose within 48-hours of vaccination and meets the four specific criteria under the QAI that define what constitutes a Table "SIRVA." 42 C.F.R. § 100.3(c)(10); § 300aa-13(1)(a). In this case, respondent raises an argument only with respect to the fourth criterion. (ECF No. 86, pp. 13-15.) Thus, there is no dispute that petitioner has satisfied the first three SIRVA criteria. Moreover, my own review of the record evidence confirms the same. That is, I find that petitioner had no prior history of pain, inflammation, or dysfunction of her left shoulder that would explain her post-vaccination presentation. She experienced a new onset of left shoulder pain within 48 hours of the vaccination at issue, and her pain and reduced range of motion were limited to the shoulder into which she received her vaccination.[10]

The fourth SIRVA criterion requires that "[n]o other condition or abnormality is present that would explain the patient's symptoms (e.g. NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, and any other neuropathy)." 42 C.F.R. § 100.3(c)(10)(iv). This element of petitioner's showing "requires consideration of a petitioner's medical condition as a whole." *Record v. Sec'y of Health & Human Servs.*, 175 Fed. Cl. 673, 680 (2025). However, while the "other condition or abnormality" at issue must qualify as an explanation for the petitioner's symptoms, it "need not be a better or more likely explanation." *French v. Sec'y of Health & Human Servs.*, No. 20-0862V, 2023 WL 7128178, at *6 (Fed. Cl. Spec. Mstr. Sept. 27, 2023). Indeed, a petitioner may fail to meet the fourth SIRVA criterion even where there is clinical evidence of an alternative condition that falls short of a definitive diagnosis. *Durham v. Sec'y of Health & Human Servs.*, No. 17-1899V, 2023 WL 3196229, at *14 (Fed. Cl. Spec. Mstr. May 2, 2023) (noting that the regulation cites "clinical evidence of" various conditions).

However, respondent does not defeat a Table SIRVA claim "simply by noting the presence of shoulder dysfunction beyond deltoid bursitis." *Grossmann*, 2022 WL

---

[10] I have considered the fact that petitioner did initially report some transient symptoms of pain and numbness shooting to her neck and arm. However, although respondent's expert noted that these symptoms could be consistent with cervical radiculopathy, he also noted that her EMG was negative and stopped short of opining that a cervical radiculopathy was present. (Ex. A, p. 5.) *See Grossmann v. Sec'y of Health & Human Servs.*, No. 18-00013V, 2022 WL 779666, at *16 (Fed. Cl. Spec. Mstr. Feb. 15, 2022) (explaining that subjective complaints of pain beyond the confines of the shoulder do not necessarily run afoul of the third SIRVA criterion when they are not diagnostically meaningful).

779666, at *16.  Because SIRVA is itself broadly defined as an unspecified musculoskeletal injury affecting the shoulder (*see* 42 C.F.R. § 100.3(c)(10)), alternative explanations based on conditions or abnormalities intrinsic to the shoulder raise a potentially more difficult question.  *See Lang v. Sec'y of Health & Human Servs*., No. 17-995V, 2020 WL 7873272, at *12-13 (Fed. Cl. Spec. Mstr. Dec. 11, 2020); *see also Durham*, 2023 WL 3196229, at *14 n.11.  In that context the question is "whether petitioner's own clinical history indicates that her shoulder pathology wholly explains her symptoms independent of vaccination."  *Lang*, 2020 WL 7873272, at *13; *see also, e.g.*, *Molina v. Sec'y of Health & Human Servs*., No. 20-845V, 2024 WL 4223393, at *8 (Fed. Cl. Spec. Mstr. Aug. 15, 2024) (finding that petitioner's diagnosis of calcific tendinitis precluded a Table SIRVA under the fourth SIRVA criterion because it is "a condition that can in itself present with acute onset of shoulder pain").  Ultimately, where the presence of another condition is apparent, petitioner bears the burden of proving that the condition nonetheless "would not explain" her symptoms.  *Durham*, 2023 WL 3196229, at *14.  Here, petitioner has met her burden of proof.

Ultimately, petitioner's surgery confirmed both of the pathologies informing the competing expert opinions – biceps tendinitis, as well as inflammation and synovitis at the rotator cuff.  (Ex. 2, pp. 413-14.)  However, Dr. Busfield has filed literature demonstrating that some conceded SIRVA cases between July 2010 and December 2016 did include findings related to the biceps tendon on MRI.  (Elisabeth M. Hesse et al., *Shoulder Injury Related to Vaccine Administration (SIRVA): Petitioner Claims to the National Vaccine Injury Compensation Program, 2010-2016*, 38 VACCINE 1076 (2020) (Ex. 18, p. 5 tbl. 5).)  Moreover, the same literature indicates that rotator cuff pathology is seen in 43% of SIRVA cases, and 13.9% of SIRVA patients were first diagnosed as having a rotator cuff problem.  (*Id.* at 5 tbls. 4 & 5.)  Accordingly, petitioner's rotator cuff pathology is compatible with SIRVA and her biceps finding is not necessarily confounding.  Regarding clinical history, Dr. Feeley's description of biceps tendonitis as an age-related degenerative condition is not a good fit for this petitioner, given that she suffered her alleged SIRVA at only 27 years of age.  (Ex. A, p. 6.)  Given all this, Dr. Feeley is not persuasive on the whole in opining that biceps tendinitis is likely to be a complete explanation for petitioner's clinical presentation independent of vaccination.

Instead, when petitioner was first evaluated by a specialist, Dr. Bajaj, he concluded that her physical exam was consistent with a SIRVA based on her history and her physical examination.  (Ex. 2, p. 17.)  At that time, petitioner had reduced range of motion as well as positive Neer and Hawkins tests, suggestive of subacromial impingement.  (*Id.* at 15-16.)  By contrast, her speed's test, an indicator of biceps pathology, was negative at that time.  (*Id.* at 16.)  Consistent with Dr. Busfield's opinion, Dr. Bajaj characterized petitioner's presentation as "mimicking adhesive capsulitis."  (*Id.* at 17.)  Accordingly, petitioner's initial presentation is not well explained by biceps tendinitis based on the treating physician's evaluation.  Although petitioner's overall course subsequently presented mixed findings with respect to rotator cuff versus biceps pathology, this does not outweigh petitioner's initial presentation.  Dr. Bajaj and Dr. Garbis both later assessed a bicipital tear based on MRI (Ex. 6, p. 37; Ex. 2, p. 36); however, both parties' experts have ultimately concluded that this was an incidental

finding that was not responsible for petitioner's pain (Ex. A, pp. 4, 9; Ex. 14, p. 8).  And, although Dr. Garbis opined that petitioner's vaccination would not cause a biceps *tear*, he did opine that petitioner's biceps tendon could have been aggravated by her immobilization of her arm as a result of her pain (Ex. 2, p. 36), which is consistent with Dr. Busfield's opinion and suggests that petitioner's biceps tendinitis would not explain her clinical course independent of vaccination.  Even Dr. Feeley, who favored biceps tendinitis as a complete explanation for petitioner's clinical presentation, agreed that she had exam findings consistent with impingement or frozen shoulder separate from any biceps pathology, opining only that they were not consistently observed.  (Ex. A, pp. 9-10.)

### b.  Factor Unrelated to Vaccination

Once petitioner has met her prima facie burden of proof, the burden shifts to respondent to demonstrate that petitioner's injury was caused by factor(s) unrelated to vaccination.  § 300aa-13(a)(1)(B); *Deribeaux v. Sec'y of Health & Human Servs.*, 717 F.3d 1363, 1367 (Fed. Cir. 2013).  Respondent has not raised any such argument in this case apart from his argument under the fourth SIRVA criterion that petitioner's condition is due to biceps tendinitis.  (ECF No. 86.)  Respondent's argument with respect to biceps tendinitis fails under respondent's shifted burden of proof for the same reasons as discussed above.

## VI.    Conclusion

After weighing the evidence of record, I find by preponderant evidence that petitioner suffered a Table Injury of SIRVA resulting from the flu vaccination she received on October 18, 2016.  Accordingly, petitioner is entitled to compensation for her SIRVA.  A separate damages order will be issued.

**IT IS SO ORDERED.**

**s/Daniel T. Horner**
Daniel T. Horner
Special Master
